Good morning, your honors. My name is Richard Raynor and I represent Sharetta Wallace. I was also trial counsel for Ms. Wallace. Defense counsel agreed to divide up their time ten minutes for me with two reserved for rebuttal. Mr. Kejain, who represents Ms. Varev, will address the court for five minutes and Mr. Altman, who represents Mr. Proshak, will also address the court. Yes, we've set the clock so it'll be separate for each of you. May it please the court. The district court in this case gutted the defense by precluding the introduction of a special rule at trial either by way of an exhibit or by way of a jury instruction. Without that information before it, the jury was unable to consider the good-faith defense because the language of the regulation itself showed that the interpretation of ProMed Ambulance Company was reasonable. I thought you were able to rely on the special rule, at least in terms of, you The court said, well first of all, we filed a motion to dismiss. The judge commented specifically and said, although it's not relevant right now, it could become relevant and it said specifically, this is at ER 205, he said nonetheless it is worth mentioning that the special rule could become relevant at trial if the defendants present evidence of their understanding of the special rule to negate the mental state required for the crimes. And so that's in fact what happened. Mr. Prochak testified. He said, I relied upon the special rule. You also had the prior statement of Mr. Mungian, the office manager, who said Mr. Prochak relied on the special rule and yet when it came time to trial, based upon the government's motion to eliminate, to preclude reference, which was granted, we were not allowed to bring it in. And then when we asked for the jury instruction, that was precluded. And the court did give a good-faith instruction but without actually seeing the special rule, which the language of it on its face says that when a... You mean the good-faith instruction made no reference to the special rule. That's correct. And we had requested that it did. And when you say you weren't allowed to bring it in, are you talking about an instruction? Because of course the defendants testified about this, certainly Mr. Prochak. So what is it exactly that you're... The way it was left was that basically the government was able to minimize and suggest that Mr. Prochak's assertion was invalid. Oh, he just talked about... Or that it wasn't believable. It wasn't believable. And without actually looking at the language itself. Right, so when you say looking at the language itself, I think you've answered my question, but I think you're complaining about not getting the instruction. Yes. Anything else? Well, if it had come in some other way, maybe the instruction, we could still have tied it in with good faith, but without... But yes, primarily it's the instruction. Because Mr. Prochak did testify about it and that he relied on it? He did. Okay. He did. And it's... Is there any appellate circuit case that adopts your theory that an instruction is required on this topic? Well, I would... The answer is no. However, I would point out that in both Reed and Medford... I'm sorry, Medlock, that no such instruction was requested. Specifically in Medlock, it's not in the briefs, but if you look... I'm sorry, in the opinion, but if you look at the instruction, there was... The district court had actually agreed that he would give the 41040 instruction, or give the language of 41040, of the special rule. But then, for whatever reason, the defense decided against it. This is in the government's brief in 14.508.4, document 26, on page 5. It says... I guess my more specific concern is, it seems to me there are some cases that pretty much go directly against your position, at least in the 5th and 6th circuits, I think. But if you look at the cases, the issue was not carefully considered. And specifically, because in both of those cases, there were issues with the PCS forms themselves, the validity of them. And in both cases, it was very clear either that they were pre-signed, or that they were somehow faked. Because ultimately, that is what is the... Medicare system relies upon the doctor to be a gatekeeper. And in this particular type of transportation for dialysis patients, it gets very expensive. And there has to be some way of controlling the amount of money that's paid. And the way that's done is having the doctor certify medical necessity. This is unlike the... for two months. And that's the balance that's found, is two months. But the other program requirements have to be met. For example, they're not going to cover... even if a doctor says it's medically necessary, it still has to be within the program requirements, such as to a dialysis facility. What about addressing the change in the regulation, which the government, the regulation itself, characterizes as a clarifying regulation, right? Right. Which is squarely against your position. Yes, exactly, Your Honor. Because to then take that away after the fact and say it has an ex post facto application, and furthermore, in this case, there was reliance on the special rule, as it was. And so to come back and say, oh, you should have known this ahead of time, or you should have... it's not fair. But counsel, is it your position that because a certificate of medical necessity had been signed in some of these cases, that, for example, the folks you represent were free to continue to bill, even though, for example, one of the individuals was described as riding up on his motorcycle in robust enough health to ride up on his motorcycle and hop in the ambulance? Well, Your Honor, I would point out... Is that really your position? Well, Your Honor, first of all, I'd point out a couple of things. First of all, that particular individual, he had only been transported for 16 days. Well, okay, but counsel, there are many... your time's ticking, so I don't want to go through the examples. You know them very well. We read the briefs. So there are many of those. Is that your position, that regardless of what was happening in the field, so to speak, they could continue to bill? Well, if it were so clear... well, first of all, it's not so clear... an EMT just is not capable of making the determination. And even Dr. Freeman testified about how judgment is impaired. At the time of trial, that particular beneficiary was deceased. So it sounds like the answer to my question is yes, no matter what they're observing in the field, once they've got the certificate, they can bill? Well, if it under... Is it looking for a yes or a no? Well, it's... I would say it doesn't matter what the EMT says unless it is so egregious that you can say that what the doctor did was incorrect, but usually... or fraudulent. Well, when you say so egregious, I don't know what that means. But, I mean, suppose, you know, the ambulance driver, you know, goes up to pick somebody up, the guy walks out the door and walks into the ambulance. Is that what you call egregious? Well, but this is the problem, is that the way the government... is that walking alone is not enough. And that's the problem. The doctor can see things like a risk of falls or the requirement of monitoring. It's not just about they need to be... that physically they need to be carried. This is about... this form of ambulance transportation requires monitoring. And so the EMT has a month of training. They can't contradict what a doctor might know about this person's... But the EMT is the one who does the monitoring at the time in the place, right? Well, they do. But what really matters, and if you look at the regulation, is the compromise that is made. And I see that my time is almost up. The compromise that is made is that the physician signs it, and it's good for 60 days. And just briefly, there's issues with the sufficiency because there was no false information presented, either electronically or in terms of false run sheets. Thank you. Thank you, counsel. We'll hear from other defendants' counsel. Good morning. I'm Sean Kajan. And I represent Amelia Zverev. I'd like to add something to what my colleague said. It wasn't merely an instruction that we weren't given. Our entire defense from the start, before trial, was based on providing the jury with the CFR that our clients relied on. Respectfully, it was for the jury to decide the credibility or the believability of our clients' reliance on the CFR. And so when Mr. Proshak testified that he and we, meaning the defendants, pro met, relied on, quote, the special rule, end quote, that language was meaningless to the jury because what does that mean, special rule? What it meant was the CFR. The court knew that. And the court specifically said that he was not going to let us, this is after trial began, and that's why we asked for the instruction, that he wasn't going to allow the CFR to be told to the jury. And so the only thing the jury had left was the government's interpretation of the law, and that was the internet-only manual, the clarifying regulations, which were not in place at the time of the transportations, and the local determinations, neither of which, the internet manual, local determinations, neither of which were law or regulations or even rose to what a CFR was. And so let the jury decide. And instead, the court, frankly, directed a verdict against us by not allowing the CFR into evidence. And I understand Your Honor's concern about, well, some person was seen driving. All right, well, that's understandable and that's troubling, but that's not what our clients saw. And let the jury decide whether their reliance or clients' reliance on the CFR to bill when a doctor says, and Dr. Freeman testified, that sometimes people, when they go through dialysis, they become delusional and they do things that are contrary to their health, such as driving a motorcycle. Counsel, I want to give you an opportunity to respond. Forgive me for interrupting, but the jury also heard evidence that there were instructions given, very direct instructions to the EMTs in the field to alter their run log so that there wasn't a record of people walking under their own steam out to the ambulance, and you're aware of that, to take out those notations. And having heard that, it's pretty tough for the jury to decide if they believe it, which apparently they did, pretty tough for the jury to conclude that your clients were relying in good faith on that regulation. I mean, if that's what they believe, they wouldn't have been concerned about the notations in the run logs. And so there's two EMTs that testified. There were over, I think, over 130 beneficiaries total. And the evidence, including from those two EMTs, were that most of the people that ProMed transported needed the transportation. And they did testify as to run sheets being altered. Some said altered, some said changed, some said they were directed, except I have to make this clear, the EMTs that testified at trial did not say that they could not recall changing any run sheets. And importantly, because there were five beneficiaries at issue at trial, not one false run sheet, not one, was ever submitted to Medicare. But the relevance of that evidence is as to your clients' good faith reliance. It's as to their state of mind. If they asked them, the EMTs, to falsify the records and the EMTs didn't, that really isn't relevant whether they followed through on the request to falsify. I mean, that's my concern anyway, because all of this is about state of mind. Yes, Your Honor. And so Rutgard, as an example, had some false documentations, testimony regarding false documentation. The court said that that, that false documentation was not sufficient and not concrete proof as to a scheme to defraud. And so here, not one. No, but it's relevant to whether they were acting in good faith. I totally agree. And it is relevant. And let the jury decide whether that alone was enough or that, like we said, which reliance on the CFR. Of course, I was going to discuss another topic that was important to us, which was the misconduct by the government in its treatment of significant defense, of a significant defense witness, which was one of the nephrologists. But that was in the papers, and I'm sure it's clear. Well, can I ask you a question about that? Because then you have an opportunity to respond. Yes, Your Honor. I think that that was well briefed. Thank you. And at the bottom line, it seems to me that the trial court signaled pretty strongly that if the defense wanted to call that witness, is it Dr. Pack? Yes, Your Honor. That there would be immunity for that witness. And my understanding is that the defense didn't ultimately call that witness. Have I got that wrong? Except for the immunity part. The court said if I wanted, I could issue a subpoena and he'd have the marshals bring him here. But, see, that was not enough because, of course, once he's committed, once Dr. Pack has made statements to a federal agent, including being surreptitiously recorded, no lawyer is going to advise Dr. Pack to say anything different than what he's said to federal agents. That was the problem. So simply providing me the opportunity to subpoena him is not going to cure the issue. The misconduct was, frankly, egregious. The case law I've cited supports my position. Providing a curative instruction, which wasn't going to fix the problem. Dr. Pack has a free will. His free will to testify was impinged, which further impinged our Sixth Amendment right to present a defense and due process. I mean, there's two nephrologists. They're the two that certified the transportations, which we've discussed the relevance of that. The government knew it was relevant because that's the only thing they discussed with when they interviewed Dr. Pack and surreptitiously recorded him, which was, don't review your medical records. It's in the recording that I've provided, Your Honor. Don't review your medical records. Tell us what you remember about these patients from 2010 and 2011. And when Dr. Pack said, well, did I sign, do you have the certifications for them, the government refused to answer the question and they ended the interview. And so the government knew it was relevant, whether the doctor certified the transportations. And so that, combined with not providing the regulation upon which Dr. Pack, well, upon which he signed the certifications, made it even more problematic for us. Thank you. Thank you, counsel. We'll hear from Mr. Altman. Good morning. May it please the Court, my name is Brian Altman. I'm appearing on behalf of the appellant, Stephen Prochak. I also join in my colleague's arguments, particularly with respect to the special rule, 42 CFR 41040. But I'm here to focus the Court on what we submit are procedural errors in the calculation of the loss calculations and the application of the guidelines. And in particular, with respect to Mr. Prochak, the substantive errors in the deviation from those guidelines. Your Honors, if we accept the government's star witness's testimony, Kathleen Montoya, that an emergency medical technician, an EMT, is not qualified or competent to determine medical necessity for ambulance transport, we then have the government partially interviewing some unidentified EMTs and getting some non-random sample to use as a loss calculation with those non-identified EMTs saying, oh, those people, there was no medical necessity. So we start with a flawed methodology, which the Court, in our opinion, blindly adopted. So the calculation that was used was based on some evidence that was, well, one, there was little if no evidence that was adduced at trial. In fact, the methodology conflicted with evidence that came out of trial. We had Dr. Freeman testify, the beneficiaries she treated, notwithstanding that they were ambulatory at times, there was a medical necessity for ambulance transport. And she, in her testimony, she went through some very graphic details along these lines. Counsel, I may be misunderstanding or misremembering this, but it appeared to me that the calculation the District Court adopted for the loss was a methodology that resulted in a lower restitution amount than some of the other available methodologies would have. Is that, am I wrong about that? You're correct. However, each of the methodologies that were proposed that the Court had the option to choose all suffered from the same, what we view as a fatal flaw, was based on some information from some EMTs about some beneficiaries that the government, we were asked for an evidentiary hearing. We asked to be able to find out how they determined which of the 13 beneficiaries that they selected. I think it was 13. However, in not a single case did the government or any of its agents go to any of the treating clinicians, the people that the government's own witnesses are the only ones that are competent to determine whether there was a medical necessity. So we kind of garbage in, garbage out. Each of these methodologies suffered from this flaw, and the Court adopted that. We view that as improper. We view that as an abuse of discretion. We think it was based on erroneous information. How should the Court have calculated this number? The Court should have relied on information that, well, should have had reliable information. It should have had the government actually go to the treating clinicians. Did you offer an alternate amount? Well, we did offer, we proposed to the Court that there be an actual valid random sampling. We proposed a method. The answer is no. You didn't say it should be X instead of Y? I believe we did. Your Honor, I'm not exactly sure what amount we proposed. However, we proposed that there was a flaw in the general process. I understand that, but my question is did you propose an alternate amount based upon some other methodology? I believe we did, but I don't actually have the amount at hand. But I know that we objected to each of the methodologies that was proposed that the Court had to select. And in particular with Mr. Proshak, and I pointed this out in our papers, obviously, there were some substantive errors. If we look at the 3553 factors, here the Court said in connection, it had a guideline range for Mr. Proshak of 63 to 78. It went to the top of the guidelines and then added two and a half years because it had an instinct that Mr. Proshak had destroyed some records, notwithstanding that. I was concerned about that initially, but it looked to me like that comment was made before the actual sentencing discussion happened. It was sort of thinking out loud. And then it appeared to me that when the actual announcement of the sentence and the findings, there was no reliance on that issue. As I understand the Court's actual calculation. Your Honor, I believe that the Court used that one, its instinct as to Mr. Proshak purportedly destroying some records, notwithstanding that the records, the evidence was that the records were with the former owner, Eric Feingold. Well, I know that comment was made, but what I'm saying is that once the actual sentencing started and the findings that supported it, that's not in there. There's stuff about lying to the Court. There's a lot of other stuff, but lack of remorse, taking advantage of employees in an economic downturn and whatnot. Are those not fair game for 3553 analysis? Those are fair game, Your Honor, but if we look at what the Court also honed in on, for example, it said that Mr. Proshak exhibited an arrogance that was offensive to the Court, because a year before he had any thought of being indicted, he had leased a BMW. And I don't believe that those are proper factors. If you look at the cases that apply in Ressam and others, I think that when you combine that, and the cumulative effect of that of saying, well, it's my instinct that he destroyed and he was arrogant, to then go to the top of the guideline range and then add two and a half years based on instinct or arrogance. So on that basis, and I see my time is up, we submit that one, his conviction should be reversed, but if the Court is not so inclined, that it be remanded for recalculation of the sentencing based on appropriate factors that are recognized. Thank you, Counsel. Thank you. And when the time comes, Mr. Rayner, you may have a minute for rebuttal, even though everybody exceeded their time. I understand there are a lot of issues. Ms. Tessier? May it please the Court, Funula Tessier on behalf of the United States. Sufficient evidence supported the defendant's convictions. The defendants knew that their patients did not need ambulance transportation, and that ProMed would not be reimbursed if Medicare knew their patients' true conditions. And so they instructed EMTs to falsify run sheets so that Medicare would pay ProMed, and then so that ProMed would pay the EMTs. It does not matter that the government was unable to produce the falsified run sheets for the substantive counts. Defendants misrepresented the medical necessity of ambulance services when submitting claims to Medicare. And the District Court properly precluded the defendants from mischaracterizing the Medicare guidelines. As two courts of appeals and the Internet-only manual, the local coverage determination, and Medicare itself have made clear, physician certification statements are necessary but not sufficient to establish medical necessity. The District Court also properly allowed ProMed EMTs to opine as to whether the patients they transported needed ambulance services. The EMTs were testifying based on their own observations of the patient made at the time of transport, which is exactly what the lay witness opinion rule allows. Also, the government did not substantially interfere with the decision of Dr. Pak to testify. Dr. Pak did not testify... I'm a formal trial court judge myself, so I'm always very sensitive that those of us working at the appellate level are pretty far removed from what was going on in the trial court. There's the texture. It's tough to communicate in the briefs, but what's very clear to me is that the judge was very concerned. That's correct, Your Honor. The judge was concerned... The government was overreaching and intimidating a witness. The judge was concerned, and the judge offered to the defendants that if they wished to call Dr. Pak, he would seriously consider ordering the government to grant immunity to Dr. Pak. And that is, of course, exactly the remedy that the defendants had asked for when they had moved for the court to compel immunity. And it's also the remedy that this court in Vavage has made clear will remove any prejudice from any purported wrongdoing by the government. Is there a response to opposing counsel's argument that basically he couldn't put the genie back in the bottle because he had been interviewed, this potential witness had been interviewed, that was recorded, the briefs by the appellants here are very clear that they took umbrage that the interview was conducted surreptitiously and without giving the documentation to the witness so that he was on record and if they had called him, he was essentially going to be a pretty ineffective witness at that point. Well, my understanding of his defense argument is that he wouldn't have testified differently because he would be subject to perjury charges if he did. But of course, if the court had ordered the government to grant immunity, the witness would not have been subject to any such charges, that's the entire point of the immunity order. And impeached pretty effectively. He may have been impeached and it's true that if the defendants had sought to have Dr. Pak testify and had him testify, that record might be before the court to assess whether or not there remained any prejudice. But of course, this court can't assess whether there remained any prejudice because the defendants did not take advantage of the remedy that the district court offered to him that this court has made clear is the exact way to remedy any problems. I'm in the uncomfortable position of talking about how the defendants didn't take advantage of the remedy but not saying very much about the government's conduct in the first instance. Whether your position is that this was acceptable conduct by the government, I'm a little concerned that I haven't heard a response to that, please. I understand, Your Honor, and we very much understand the district court's concerns and we understand your concerns and we take them very seriously. I agree that the government could have done things in retrospect, we certainly could have done things better. In light of the fact that there was no concrete evidence of fraud by the doctors, it would have been far more prudent of us to have interviewed the doctors before filing the motion in limine, which of course we did not renew. And upon determining that the doctors weren't involved, it would have been more prudent for us to tell the district court that much sooner than we did. So we do understand that mistakes were made. There was no finding here of prosecutorial misconduct, however, because no such finding was necessary because the court offered the defendants the relief that they sought in district court and the defendants chose not to take advantage of it. Testier, you seemed to infer earlier that the immunity agreement includes immunity from possible perjury. Is that your position? Is that the usual immunity agreement? I think one can write immunity agreements differently, but that was the central question in Vavages, which is the case that defendants rely on. In that case, the witness in question was expressly told, or all but expressly told, that if she provided the alibi defense for the defendant she planned to provide, that she would be prosecuted for perjury and more than that, she would have her plea agreement and separate charges revoked. And the Ninth Circuit said that the district court could have eliminated any possibility of prejudice by requiring that the government grant immunity to that witness or dismiss the charges. So I do think Vavages covers exactly that issue. Counsel, could you turn to the... I'm interested in your response to Mr. Prochak's argument about his sentencing. Yes, Your Honor. I believe the court was entitled to rely on the 3553A factors in sentencing Mr. Prochak to an above-guideline sentence. The court was particularly concerned about the nature of the offense, that it took money away from programs that are designed to help poor people, that he abused his position of power over Ms. Wallace in particular. He was the person who financially benefited from this fraud, and he roped in other people who weren't receiving the same kinds of benefits, but are experiencing the consequences at the other end. Counsel, what about the... forgive me for interrupting, but I didn't ask a very good question. What I'd like you to focus on, if you would, is the calculation of the restitution. Maybe I didn't make that clear, sorry. Certainly. As to the loss calculation. Yes. Yes, Your Honor. The court relied on a very conservative estimate of loss. Well, it relied on the lowest. I'll give you that, but why... their specific concern is, of course, there were the five who were indicted and then nine more, and they're concerned about the randomness of the sample. Well, the randomness of the sample argument goes to the percentages that were determined by that sample, and of course the court did not rely on those percentages. The court said, I'm going to take the particular patients where there is evidence that there is no medical necessity, and determine how much was paid for those particular patients. What did the court know? I know what the court knew about the five. What did the court know about the other nine that was in that batch? That they were identified by EMTs or by the agents as not requiring medical necessity, and that there's a declaration of Agent Ramirez, and she said that agents went out and interviewed those individuals and determined that they did not need ambulance transportation. And so one of their arguments is that those EMTs were not identified. Is that a fair comment? The... I think that goes to the weight of the evidence as opposed to its admissibility. Is that yes, they didn't know who the EMTs were that Agent Ramirez worked with? Is that fair? It does not. It does not say in the... I'm sorry, I should say that EMTs who were interviewed are identified in the affidavit, but the EMTs are not linked to the particular patient. So they did know who the EMTs were. Right. I think you've answered my question, and that's consistent with my recollection, but I'll verify that. What about the argument that... What about... Oh, wait a minute. Maybe you answered my other question as well. I think you have, actually. Go ahead. I'd also just like to note that this is a case where there's evidence of pervasive fraud in a company. The district court is actually allowed to assume that all of the billings to Medicare are intended loss. And, of course, the court didn't do that here. The court took a much more conservative estimate than has been allowed by this court in other cases. Do you... Is the basis of that statement that the court only measured the amount actually paid as opposed to the amount billed? It's both, Your Honor. So the guidelines consider both intended loss and actual loss. And there are cases that say that the amount billed can be deemed intended loss. Now, of course, on the flip side of that, there are also cases saying that where it's understood that Medicare will discount, then you can't really assume the entire billing amount. But this number that we're working with was discounted, right? The court took into account the fact that it was anticipated that the entire amount billed was never going to be paid. So the court here... The court didn't find intended loss. It found actual loss based on the actual amount paid to ProMed. Right. That was my earlier question. And the answer to that is yes? Yes, that is correct. Not the billed amount, not the intended-to-be-paid amount. It's the actually paid amount. That's my understanding. Yes. Okay. Could I ask... I remember the other question. I don't think I did get you to focus on. We asked opposing counsel whether or not they had... Or maybe Judge Tashima asked whether they had volunteered a different number, a different calculation? I was... And I apologize, Your Honor. I can't remember exactly if they put a particular number in their briefing. I was quickly looking through the sentencing transcript for Mr. Proshak's sentencing, and I don't see a particular number in there. But it is possible that they gave one. I just can't recall one. Okay. Thank you. Maybe you can now tell us your view about the defendant's special rule argument. I mean, not just a jury instruction, but, you know, the in-memory ruling that prohibited them from mentioning the special rule at... And from introducing it? From introducing it, you know, making witnesses referring to it, and so forth. Well, the court very clearly did not prohibit the defendants from referring to the special rule or having any evidence of the special rule come in. You can refer to it, but I think the argument is, well, you know, what's the point when, you know, the jury doesn't have the rule before them so they don't know what you're referring to, right? Yes, I understand, Your Honors. Question. There's nowhere in the record where the... There's one point that defendants raise in their reply brief where they claim they tried to actually get the text of the rule in as evidence. And that was in the cross-examination of Kathy Montoya. And during her cross-examination,  the court later explained it doesn't grant sidebars. And then they... After Ms. Montoya had left the stand, when Ms. Ramirez was being questioned, defense counsel then said, well, Your Honor, we wanted to impeach Ms. Montoya by you taking judicial notice of the regulation. Now, the court denied that, and it's not clear that that was an appropriate use of impeachment, first because Ms. Montoya had not actually said anything inconsistent with the regulations. There was a dispute over whether the terminology applied to the certification statement. But... But it's also not clear that that would have been proper impeachment by extrinsic evidence. Defendants did not, during Mr. Prochak's testimony, which I think would have been the appropriate time, did not ask Mr. Prochak to, for example, read a copy of the regulation and say, is this the regulation that you read, and what did you understand it to mean? They did ask him about the regulation, and so, of course, did proffer affirmative evidence of the regulation. Counsel, where do... Your argument is that this is sort of harmless, because he was able to speak to the regulation and speak to his good faith. Where do you think we should find in the record the most fulsome statement, I guess it's going to come in somewhere, through Mr. Prochak, where they were allowed to essentially introduce to the jury the notion that they relied on the special rule? So it's in two places. There are, I believe, at least six references to the CFR or 42-410 in Ms. Montoya's cross-examination, and that comports with the judge's pretrial ruling. The judge says that, this is at 180 of the excerpts of record, the government has moved the court to exclude any misstatements of the law in opening statement or by argument of counsel. And the court said, there's a few pages, but the court says, as to that portion of the motion, I'm going to grant that. The judge said, however, since the defendants are testifying that they relied on the special rule, I'm going to allow there to be evidence of the physician certification statements, of the reliance, and I'm going to allow liberal leeway in cross-examining Ms. Montoya. So there's no express discussion of... So I'm asking a different question, if I could, and I appreciate those references. I think those are the ones I've got, though. Yes. Where do you think, since it's your position, I think it's your position, that Mr. Prozac was, or Prochak was allowed to, sorry, was allowed to explain this good faith defense. Where do you think I find that in his testimony most vividly? I believe it was at 843, I'm sorry, let me find exactly the reference for you. But he was allowed to, I'm sorry, at excerpts of record 1103 and 1158-60, Mr. Prochak testified that he read the special rule and that he believed that the physician certification statements were enough. Okay, so can I ask another question? It's tough without the jury seeing the text, that's their argument. So was Ms. Montoya's testimony earlier than Mr. Prochak's testimony? It was. Yes, Your Honor. Now the jury disbelieved Mr. Prochak's testimony, in part because he himself testified that the run sheets were important to bill Medicare and because there would have been, if it were true, that the defendants relied in good faith on the physician certification statements, there of course would have been no need to falsify the run sheets. Why would you risk exposing yourself to fraud by falsifying Medicare documentation if you believe that you had the document in hand that conclusively established medical necessity? I think what this comes down to is the jury simply didn't believe Mr. Prochak's testimony, the district court didn't believe his testimony, said at sentencing that he was not a credible witness, and that's why the defendants were convicted in this case. If the court has no further questions. No, we don't. Thank you very much. Mr. Raynor, you may have a little bit of rebuttal time here. Your Honor, as to this issue of why would there need to falsify documents if there was no intent to commit fraud, I would suggest a couple things. One, both Mr. Prochak and one of the EMTs testified that the EMTs were instructed to put people on a gurney whether they could walk or not, and so that was the instruction, and sometimes EMTs would mess up. In terms of the actual instructing to change the run sheets, EMT Jones said that she was never instructed to change a run sheet, and EMT Holt said that it was very rare that he would be instructed. And what about the staff meetings where the instructions were given? Those were to put them on a gurney whether they can walk or not, and what I would suggest is that just like in Rutgerd, where there you have an ophthalmologist who had a certain test results and falsified, put in every file, and so some of them clearly were falsified, yet there was they said without concrete proof, they said in his practice it wasn't permeated by fraud, because it wasn't permeated by fraud, you couldn't just assume that it was intended to submit a claim for unnecessary procedures. Thank you, Counsel. The case just argued is submitted, and we very much appreciate the arguments from all of you. They've been very helpful. We will take a 10-minute recess and come back with a slightly different panel configuration for the rest of the docket.
judges: Tashima, Graber, Christen